UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **LOGAN DAVIS** | **2:20-CV-11499-TGB-DRG** |
| Plaintiff, | |
| vs. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 24)** |
| **JEREMY WALLEMAN,** | |
| Defendant. | |

In 2019, on a rainy April night in Sterling Heights, Michigan, 18-year-old Logan Davis had just gotten off work at a sandwich shop and was waiting under a nearby awning for his dad to pick him up and drive him home. A few minutes later, Davis ended up hand-cuffed in the back of a Sterling Heights police cruiser, having been forcibly taken to the ground and arrested for loitering. Davis brought this lawsuit against Officer Jeremy Walleman and the City of Sterling Heights for what he alleges was an unlawful arrest for loitering and failure to produce identification. Davis asserts claims alleging a violation of his First, Fourth and Fourteenth Amendment rights, along with state law claims accusing Officer Walleman of failing to perform ministerial duties, malicious prosecution, gross negligence, false arrest, false imprisonment, intentional infliction of emotional distress and racial discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA").

Subsequently, Plaintiff Davis dismissed his *Monell* claims against Sterling Heights, and some of his claims against Officer Walleman. *See* ECF No. 26, PageID.524. Now before the court is Officer Walleman's Motion for Summary Judgment on all remaining claims. For the reasons below, Officer Walleman's Motion for Summary Judgment will be **GRANTED IN PART** and **DENIED IN PART**.

## I.   BACKGROUND

At the time of the incident here, Plaintiff Logan Davis was 18 years old and a resident of Sterling Heights, Michigan. Pl's Dep., ECF No. 24-6, PageID.349. Davis, who is Black, held a variety of part-time jobs throughout high school, including a job at Firehouse Subs on 16 Mile Road and Van Dyke Avenue in Sterling Heights from February 2019 through approximately June 2019. *Id.* at PageID.357-59. Defendant, Officer Jeremy Walleman, was at that time a 16-year veteran patrol officer with the Sterling Heights Police Department. ECF No. 24, PageID.143.

On April 25, 2019, Davis was working a 3:00pm-to closing (9:00pm) shift at Firehouse Subs. ECF No. 24-6, PageID.362. At the time, Davis did not own a car and so his father would drive him to and from work. *Id.* at PageID.363. On a normal closing shift, Davis would finish work between 9:00 and 9:10 p.m., but because closing duties took longer that night, he finished between 9:40 and 9:45p.m., a little more than a half hour later than usual. *Id.* at PageID.371. That evening, Davis' father had

2

arrived around 9:00p.m., but because Davis was not yet ready, and because Davis' home was only a few minutes away, he returned home to wait until Davis was ready to be picked up. *Id.* at PageID.371.

Once Davis finished closing, he left the store and stood outside, waiting for his ride. *Id.* at PageID.371-72. Because it was dark and raining, Davis stood under the Dickey's Barbeque awning two doors down from Firehouse Subs. *Id.* at PageID.372. Davis testified that he decided to stand under the Dickey's Barbeque awning because it was lower and stuck out farther than the Firehouse Subs awning, and thus gave more protection from the rain. *Id.* Additionally, Dickey's Barbeque had a neon light in one of the restaurant's front windows which Davis believed would help his dad see him. *Id.* at PageID.376. While waiting outside, Davis called his dad to tell him he was ready and listened to music. *Id.* at PageID.369.

At 9:47 p.m., Officer Walleman was travelling down Van Dyke Avenue on routine patrol and saw a person—who later turned out to be Davis—standing in front of Dickey's Barbeque. Walleman Aff., ECF No. 24-4, PageID.321. Officer Walleman testified that when saw the individual from the road, he could not determine the person's race or sex. *Id.* Walleman testified that, because he was aware of a number of prior

3

commercial break-ins in the area,[1] all the businesses in the strip mall were closed, and no vehicles appeared to be in the parking lot, he decided to investigate. *Id*. at PageID.322.

The Court has reviewed video recordings that provide footage and audio from different vantage points showing what happened next: the dash cam of the of the police vehicle, ECF No. 24-8, and the cell phone camera of Plaintiff Logan, ECF No. 24-7. The summary below is based on these sources of evidence. Officer Walleman pulled up to Dickey's Barbeque and asked Davis what he was doing, and if he worked in the strip mall. Pl's. Cell Phone Video, Exhibit E, ECF No. 24-7, at 00:01. Davis told Officer Walleman he worked at Firehouse Subs and was waiting for his dad. *Id*. at 00:02-00:04. Officer Walleman then asked for Davis' name, to which Davis responded "Logan." *Id*. at 00:04-00:06. Officer Walleman responded by asking "Logan what?" *Id*. at 00:06-00:08.

---

[1] According to police reports submitted by Defendant, during the year prior to the incident in question, 28 commercial burglaries and break-ins occurred throughout Sterling Heights, six of which occurred "in and around the Van Dyke Ave corridor." ECF No. 24, PageID.143; Def's Ex. A, ECF No. 24-2, PageID.179. Additionally, in 2016, a string of commercial burglaries included an attempted break-in at the Tropical Smoothie Café located two doors down from Firehouse Subs. *See generally,* Def's Ex. B, ECF No. 24-3. Officer Walleman testified that he was aware of the "numerous commercial break-ins that occur every year in Sterling Heights" and specifically knew of the "attempted evening-hours break-in at the Tropical Smoothie Café in the same strip mall [as Firehouse Subs] a few years earlier." Walleman Aff., ECF No. 24-4, PageID.321-22. The suspect in that string of break-ins was ultimately arrested, and pleaded guilty. *See generally*, ECF No. 24-3, PageID.305.

Davis did not provide his last name, but instead asked why Walleman wanted to know what Davis' last name was. Officer Walleman proceeded to explain that he was concerned that Davis was standing in front of closed businesses and asked for Davis' identification so he could "write [Davis'] name down that [Walleman] talked to [Davis.]" *Id*. at 00:09-00:25.

Officer Walleman and Davis then argued about whether Davis was required to provide his identification and at one point, Officer Walleman told Davis "you're standing in front of closed businesses and you're loitering," *Id*. at 00:50-00:56, to which Davis asked, "how am I loitering if I just got off, [I'm] waiting on my dad?" *Id*. at 00:57. Officer Walleman responded by asking Davis "how am I supposed to verify that, brother?" *Id*. at 00:55-00:59.

At this point, it appears that Davis unzipped his jacket and showed Officer Walleman his work uniform. Dash-Cam Video, ECF No. 24-8, 01:29-01:33. Davis also claims that he showed Officer Walleman his work shirt and employee badge. Davis Aff., ECF No. 26-1, PageID.571. Officer Walleman then responded, "Okay, well, now let me see your – ok, well, let me see your ID." *Id*. Davis and Officer Walleman continued to argue about whether Davis was required to provide his identification. Eventually, Officer Walleman told Davis to "turn around and put your hands behind you back. You're not identifying yourself" and Davis began backing away. *Id*. at 01:38-01:42. As Officer Walleman attempted to pull

Davis' right arm behind his back and repeated "put your hands behind your back," Davis continually said, "that is illegal" and "what is your reason" while holding his cell phone in his left hand and not putting it behind his back. *Id.* at 01:42-56.

Officer Walleman then tackled Davis to the ground, pinning him on his right side and pressing his head into the pavement in an attempt to handcuff his hands behind his back. *Id.* at 01:56-01:59. While Davis was pinned on the pavement, he and Officer Walleman continued to argue about Davis' refusal to put his hands behind his back and provide identification. *Id.* 01:59-0:3:00. After about one minute, additional officers arrived, quickly assisted Officer Walleman in handcuffing Davis, and placed him a police car. *Id.* 03:00-4:10.

Once Davis was handcuffed and in the patrol car, his father arrived and Officer Walleman explained why Davis had been arrested. After a brief argument about whether Davis should have been arrested at all, Davis' father said "[i]f he was white, you wouldn't do it." ECF No. 24-8, at 10:13-10:18; Delbert Davis Aff., ECF No. 26-6, PageID.606. To which Officer Walleman responded, "[a]bsolutely, 150 percent." *Id.*

Davis was charged with loitering and resisting arrest, but, the charges were eventually dismissed. Davis Dismissal, ECF No. 24-13, PageID.516. On June 8, 2020, Davis filed this lawsuit against Officer Walleman and the City of Sterling Heights alleging First Amendment retaliation, violations of his Fourth and Fourteenth Amendment rights

to be free from wrongful investigation, imprisonment, arrest, excessive force and racial discrimination. ECF No. 1. Davis also brought several claims under state law for failure to perform ministerial duties, gross negligence, false arrest, false imprisonment, intentional infliction of emotional distress, and racial discrimination. *Id*. At the conclusion of discovery, Defendants filed a Motion for Summary Judgment on all claims, and that motion is fully briefed. *See* ECF Nos. 24, 26, 30. The Court held a hearing on the motion on February 16, 2022.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)(internal marks and citation omitted); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita*, 475 U.S. at 587 (internal marks and citation omitted, emphasis in original). The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001)(citation omitted). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 251-52.

## III.   ANALYSIS
### A. Claims against Officer Walleman under 42 U.S.C. §§ 1983 and 1985.

The doctrine of qualified immunity shields government officials from personal liability "for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Everson v. Leis*, 556 F.3d 484,

494 (6th Cir. 2009)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 181 (1982)). Qualified immunity balances two interests: "the need to hold public officials accountable when they exercise their power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It applies regardless of whether the government official's error is a mistake of law, mistake of fact or a combination of the two. *Id*.

Therefore, at the summary judgment stage of a § 1983 action against a police officer, the plaintiff has the burden of demonstrating that the defendant is not entitled to qualified immunity because (1) the officer violated a constitutional right and (2) that right was clearly established. *Everson*, 556 F.3d at 494 (citing *Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008)). That is, a plaintiff must first make out a prima facie case that a constitutional right of theirs has been violated and second, they must establish that the law was so clear at the time of the incident that a reasonable officer in such a scenario would have known she was violating it. *Cain v. City of Detroit*, No. 12-12-15582, 2016 WL 6679831, at *2 (E.D. Mich. Nov. 14, 2016) (citing *Smith v. City of Wyoming*, 821 F.3d 697, 708-09 (6th Cir. 2016)). Though the plaintiff bears the burden of production on the qualified immunity issue, the court must still view the evidence, and draw all reasonable inferences, in favor of the non-moving party. *Cain*, 2016 WL 6679831 at *3.

### i.   Davis' Fourth and Fourteenth Amendment claim for wrongful investigation, arrest and imprisonment may proceed

Davis alleges that his Fourth and Fourteenth Amendment rights to be free from wrongful investigation, arrest and imprisonment were violated when Officer Walleman detained and arrested him without any probable cause to believe that a crime was being committed. ECF No. 1, PageID.7. Conversely, Officer Walleman asserts that he possessed reasonable suspicion to stop and detain Davis based on Davis' unusual presence at the strip mall after closing, Officer Walleman's knowledge of prior attempted break-ins, and Sterling Heights' Ordinance prohibiting loitering. ECF No. 24, PageID.157-159. Then, once Davis failed to comply with Officer Walleman's lawful request to provide proper identification and dispel any concern of loitering, Walleman claims he had probable cause to initiate an arrest. *Id.* at PageID.159. However, Officer Walleman asserts that even if reasonable suspicion and probable cause did not exist, he nevertheless possessed *arguable* probable cause and is therefore entitled to qualified immunity. *Id.* at PageID.157-160, 166.

The Fourth Amendment of the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *Terry v. Ohio*, 392 U.S. 1, 8 (1968) (quoting U.S. Const. Amend. IV). A warrantless arrest, like the one at issue here, is reasonable under the Fourth Amendment if supported by "probable cause to believe that a

10

criminal offense has been or is being committed." *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). An officer has probable cause "only when he discovers reasonably reliable information" that that an individual has committed or is committing a crime. *Gardenhire v. Schubert*, 205 F.3d 303, 318, (6th Cir. 2000).

Where an officer lacks probable cause but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he or she may conduct an investigative "*Terry*" stop and briefly detain that person to investigate the circumstances. *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994)(citing *Terry*, 392 U.S. 1). During a *Terry* stop, an officer may request that a suspect identify him or herself, and the suspect does not have a Fourth Amendment right to refuse the request. *Barrera* v. *City Mt. Pleasant*, 12 F.4th 617, 622 (6th Cir. 2021)(citing *Hiibel v. Sixth Judicial District Court of Nevada*, 542 U.S. 177, 187-89 (2004). Additionally, a state may criminalize refusal to provide identification during a *Terry* stop. *Id.*

For Davis to show a violation of his Fourth Amendment rights, he must show that Officer Walleman lacked probable cause to conduct an arrest for either loitering, or for refusing to produce identification. As to the former, Davis must show that Officer Walleman had no probable cause to believe he was loitering. As to the second, because it would only be illegal for Davis to refuse to provide identification during a valid *Terry*

stop, Davis must show that reasonable suspicion to stop and detain Davis (1) did not exist or (2) existed but was dispelled. However, if reasonable suspicion was present throughout the entire encounter with Davis, there is no dispute that Officer Walleman ordered Davis to produce identification and Davis refused to do so. That would provide probable cause to arrest Davis for refusal to provide identification in response to a lawful request.

Davis must also show that Officer Walleman is not entitled to qualified immunity. If the Court agrees that Davis was arrested without probable cause, the Court must determine whether the right to be free from such an arrest was "clearly established" at the time of the incident. While the right to be free from arrest without probable cause is unquestionably "clearly established," the Supreme Court has cautioned against defining a right at a high level of generality. *See Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987). In the context of an arrest alleged to be unsupported by probable cause, the ultimate question is whether a "reasonable police officer in the same circumstances and with the same knowledge . . . *could* have reasonably believed that probable cause existed in light of well-established law." *McLeod v. Bender*, No. 2:13-CV-12878, 2015 WL 1470071, at *9 (E.D. Mich. Mar. 30, 2015)(Michelson, J.)(citing *Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 459 (7th Cir. 2010), *Fowler v. Burns*, 447 F. App'x 659, 661 (6th Cir.2011))(emphasis in original). This has been referred to as "arguable probable cause." *Id.* The

same analysis applies to situations where officers are alleged to have conducted an investigative stop without reasonable suspicion. If officers had "arguable reasonable suspicion," they are entitled to qualified immunity. *See, e.g., Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019).

### a. Sterling Heights City Code of Ordinances

Section 35-17 of the Sterling Heights' City Code of Ordinances prohibits loitering and states in part:

> (A) No person shall loiter in a place, at a time or in a manner not usual for law-abiding individuals, under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity. Among the circumstances which may be considered in determining whether the alarm or immediate concern is warranted is the fact that the person takes flight upon the appearance of a police officer, refuses to identify himself or herself or manifestly endeavors to conceal himself or herself or any object.
>
> (B) Unless flight by the person or other circumstances makes it impracticable, a police officer shall, prior to any arrest for an offense under this section, afford the person an opportunity to dispel any alarm or immediate concern which would otherwise be warranted by requesting him or her to identify himself or herself and explain his or her presence and conduct.

Def's. Ex. I, ECF No. 24-10, PageID.507. Under § 35-17, it is unlawful for a person to loiter as that conduct is defined in the ordinance. Therefore, an officer may conduct a stop and detain an individual to investigate possible loitering. However, prior to making an arrest for the unlawful conduct, the officer must provide the individual with an opportunity to

13

dispel any concern or alarm—which can be accomplished by the individual identifying themselves and providing a reason for their presence.

Sterling Heights' City Code of Ordinances also provides in § 35-19(B)(4) that it is a violation to fail to produce identification upon the request of an officer who is investigating possible unlawful conduct:

> (B) No person may, by physical, verbal or passive action or inaction:
>> (1) Willfully resist or attempt to resist arrest which he or she knows is being made by a police officer;
>> . . .
>> (4) Willfully fail or refuse to provide identification to an officer who is investigating possible unlawful conduct;
>> (5) Willfully fail or refuse to obey lawful commands of a police office during an arrest, search, traffic stop, or other lawful execution of the police officer's duties;
>> . . .
>> (8) For purposes of this section, the phrase ***POSSIBLE UNLAWFUL CONDUCT*** means a potential violation of any provision of the city code, where the police officer has reason to believe a misdemeanor or civil infraction violation has occurred.

Def's. Ex. M, ECF No. 24-14, PageID.518 (emphasis in original). Thus, if an individual refuses to provide proper identification to an officer who makes a lawful request for such identification while investigating possible unlawful conduct, like loitering, the individual has committed a crime under § 35-19(B), the officer has probable cause to make an arrest.

**b. A reasonable juror could conclude that, even if arguable reasonable suspicion existed, it was dispelled during the interaction**

Davis' claim that his arrest was unlawful due to a lack of probable cause turns on whether Officer Walleman possessed the reasonable suspicion required detain Davis and investigate the circumstances. If Officer Walleman had reasonable suspicion to investigate Davis for loitering under § 35-17, he could lawfully order Davis to produce identification then, under § 35-19(B)(4), arrest him if he refused.

To conduct an investigatory stop, reasonable suspicion requires that an officer have more than a hunch—they must possess a particularized and objective basis for suspecting the individual of criminal activity. *United States v. Collazo*, 818 F.3d 247, 257 (6th Cir, 2016). Such a determination of probable cause or reasonable suspicion must be based on the totality of circumstances, considering "both the inculpatory *and* exculpatory evidence"— that is, an officer "cannot simply turn a blind eye toward evidence favorable to the accused," nor "ignore information which becomes available in the course of routine investigations." *Wesley v. Campbell* 779 F.3d 421, 429 (6th Cir. 2015)(emphasis in original, internal marks and citation omitted).

Based on the facts and circumstances leading up to the stop, a reasonable jury could conclude that, even if reasonable suspicion to investigate Davis for loitering existed early in the encounter—and it is

not clear that it did—any reasonable suspicion, even arguable reasonable suspicion, was dispelled when Davis explained to Officer Walleman why he was standing where he was and showed Officer Walleman his Firehouse Subs shirt and badge. After that point, a jury could conclude, no reasonable officer would believe they had a justified suspicion of unlawful loitering, and without such a basis, Officer Walleman no longer had the legal authority to demand Davis' identification and arrest him if he refused.

After finishing his shift at Firehouse Subs, Davis was standing outside the restaurant, two doors down and under one of the strip mall's awnings, waiting for his dad to pick him up. EFC No. 24-6, PageID.368-69. Both parties agree that at the time Davis was standing outside and Officer Walleman drove by, it was dark and raining. ECF No. 24-6, PageID.366; ECF No. 24-4, PageID.321. Davis testified that he was sheltering under the Dickey's Barbeque awning two doors down from Firehouse Subs because it offered better protection from the rain. ECF No. 24-6, PageID.366-67. Davis also noted that he chose to stand in front of Dickey's Barbeque because a neon light in one of the restaurant's front windows would make it easier for his dad to see him. *Id*. When Walleman arrived at the strip mall, as can be seen from his vehicle's dash camera, there was no indication that Davis was attempting to enter any business, peering into windows, or doing anything else suspicious that would suggest criminal activity had occurred or was in process. ECF No. 24-8,

16

at 00:13. It is clear that he was holding a cell phone and otherwise simply standing there. *Id.* Even assuming that Officer Walleman possessed the reasonable suspicion required to conduct an investigatory stop at the initial stages of the encounter, a reasonable jury—if it believed Davis' testimony that he showed Walleman his badge and shirt and further concluded that Walleman saw both—could conclude that any reasonable suspicion or even arguable reasonable suspicion of loitering was dispelled. Once Officer Walleman approached Davis outside Dickey's Barbeque, Davis indicated he worked at Firehouse Subs and was waiting on his dad. Transcript, ECF No. 24-9, PageID.482. After some back-and-forth, Officer Walleman asked Davis how Walleman could verify that Davis did in fact work at Firehouse Subs without Davis' identification. *Id.* at 484. In the video from Officer Walleman's patrol car, it does appear that Davis unzips his jacket and shows Officer Walleman his work uniform. ECF No. 24-8, at 01:29-01:33. Davis also testified that he did unzip his jacket to show Officer Walleman his uniform. ECF No. 24-6, PageID.390-91. Although one cannot tell for certain from the video whether Officer Walleman actually saw and took note of Davis' Firehouse Subs shirt, his response does suggest that he was looking at something. After Davis appeared to show Walleman his shirt, Walleman responded "okay, well, now let me see your–ok, well, let me see your ID." ECF No. 24-9, PageID.486; ECF No. 24-8, at 1:29-1:33. And, from the vantage point of Davis' cell phone video footage, Officer Walleman does appear to

17

have looked down towards Davis' shirt when Davis unzipped his jacket. ECF No. 24-7, at 01:00-01:05. Although Officer Walleman testified that even though "[Davis] attempted to show [Walleman] something," he did not see the uniform, ECF No. 26-5, PageID.601, a reasonable juror could infer that Officer Walleman's response of "okay, well, now let me see your–ok, well, let me see your ID" was an acknowledgement that Officer Walleman had seen Davis' uniform and/or employee badge.

Although it is clear that Davis refused to provide proper identification, a reasonable jury could find that Davis' explanation for his presence outside Dickey's Barbeque and providing Officer Walleman an opportunity to view his uniform were sufficient to dispel any even arguable suspicion of loitering under § 35-17 of the Sterling Heights City Code of Ordinances or of any other criminal activity. If a jury were to believe Davis' testimony, at that point, Officer Walleman was presented with a young man taking shelter from the rain, wearing the uniform and carrying the employee badge of a business next door, who had attested he was waiting to be picked up by his father, less than an hour after the business at which he said he worked had closed.

Once Davis explained his presence and, if a jury were to so find, displayed his employee uniform and badge, any argument for reasonable suspicion effectively boils down to two things: (1), there had been an attempted break in at a nearby store "a few years earlier," Walleman Aff., ECF No. 24-4, PageID.321-22, the perpetrator of which was eventually

18

arrested and; (2), it was evening and the nearby businesses were closed. Even if a single attempted break-in several years earlier, for which the perpetrator was arrested, is sufficient to render a strip mall a "high crime area," and it almost certainly is not, the Sixth Circuit has rejected the notion that late-night presence in a "high crime area" is a sufficient justification to conduct an investigative stop. *See United States v. Blair*, 524 F.3d 740, 750-51 (6th Cir. 2008). Additionally, while "[a] late hour can contribute to reasonable suspicion; [Sixth Circuit] cases so holding typically involve a much later hour than that involved here." *Id*. (discussing stops that took place at 1:00am and 1:20 am, and concluding that it was of little probative value that a stop took place at 10:30pm). Moreover, here, Davis was not nervous (far from it, as he remained remarkably poised and polite to the officer throughout the encounter), and made no attempt to conceal any objects or walk away, as has supported reasonable suspicion in other cases. *See, e.g., United States v. Brown*, 310 F. App'x 776, 781 (6th Cir. 2009).

Nothing Officer Walleman discovered during his brief investigation cast doubt on the explanation Davis provided for his presence, nor did Davis exhibit any signs of suspicious behavior—he merely refused to provide his last name or his identification. If Davis' testimony regarding his shirt and badge are believed, the total dearth of evidence establishing reasonable suspicion is such that a reasonable officer could not have believed reasonable suspicion existed to continue investigating Davis for

the crime of loitering—that is, not even arguable reasonable suspicion existed. A genuine issue of material fact exists as to whether Officer Walleman did in fact see Davis' uniform and badge, thereby dispelling any arguable reasonable suspicion of loitering or other criminal activity. Therefore, summary judgment on the Fourth Amendment claim of wrongful investigation, arrest and imprisonment will be denied.

### ii.   Davis cannot overcome qualified immunity on his excessive force claim

Officer Walleman argues that his use of force, a takedown maneuver, was objectively reasonable based on Davis' resistance and refusal to put both hands behind his back. ECF No. 24, PageID.163-64. Officer Walleman argues that, even if the level of force was excessive, he is entitled to qualified immunity and Davis' claim of excessive force must be dismissed. *Id*. PageID.166-67. On the other hand, Davis argues that because Officer Walleman lacked any reasonable suspicion or probable cause to conduct an investigatory stop or arrest, any use of force was per se excessive and violated Davis' Fourth Amendment rights. ECF No. 26, PageID.557.

The Fourth Amendment protects individuals from the use of excessive force by law enforcement officers. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Under *Graham*, all claims of excessive force by law enforcement officers, whether in the course of "an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the

Fourth Amendment and its 'reasonableness' standard." *Id*. The inquiry is objective and considers "whether officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397. Factors relevant to the reasonableness inquiry of an officer's use of force include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396.

Davis argues, without citation to authority, that because Officer Walleman's investigatory stop and arrest lacked reasonable suspicion and/or probable cause, *any* use of force was per se excessive and therefore violated his Fourth Amendment rights. ECF No. 26, PageID.557 ("Walleman had no reasonable suspicion or probable cause . . . [u]nder the circumstances . . . any force that Walleman used would be excessive"). The Sixth Circuit has not adopted such a broad *per se* rule, and the Third, Seventh, and Ninth Circuits have explicitly rejected this argument, explaining that "the lawfulness of an arrest is irrelevant to an excessive force analysis." *Sebright v. City of Rockford*, 585 F. App'x 905, 907 (7th Cir. 2014) (collecting cases); *Carlson v. Bukovic*, 621 F.3d 610, 622 n. 19 (7th Cir. 2010)(same). As then-Judge Sotomayor explained in a 2006 case, "the reasonableness test established in *Graham* remains the applicable test for determining when excessive force has been used, including those

21

cases where officers allegedly lack probable cause to arrest." *Jones v. Parmley*, 465 F.3d 46, 62 (2d Cir. 2006).[2] Absent clear authority from the Sixth Circuit declaring otherwise, the Court is persuaded by the logic of the cases discussed above that the ordinary *Graham* reasonableness test applies to excessive force claims where the legality of the arrest is also at issue.

### a. It was not clearly established that the takedown was excessive

At the time of Davis' arrest, it was clearly established that an individual has a constitutional right to be free from excessive force when they are not actively resisting police. *Moser v. Etowah Police Department*, 27 F.4th 1148 (6th Cir. Mar. 3, 2022). Actively resisting arrest includes "physically struggling with, threatening or disobeying officers" as well as "refusing to remove your hands for police to handcuff you, at least if that inaction is coupled with other actions of defiance." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015). But "noncompliance alone does not indicate active resistance; there must be something more" such as "a verbal showing of hostility," a "deliberate act of defiance using one's own

---

[2] The Sixth Circuit also seems to have implicitly endorsed this argument, adopting the reasoning of a Third Circuit decision in which a court held that "the illegal entry into a suspect's home by officers did not automatically expose those officers to liability for any injuries that the suspect may have suffered as a result of excessive force employed during the arrest." *Est. of Sowards v. City of Trenton*, 125 F. App'x 31, 41-42 (6th Cir. 2005)(citing *Bodine v. Warwick*, 72 F.3d 393 (3rd Cir. 1995)).

body," or "some other mechanism." *Eldridge v. City of Warren*, 533 Fed. App'x 529, 535 (6th Cir. 2013). Review of Sixth Circuit case law does not clearly establish that Officer Walleman's takedown maneuver was excessive in view of Davis' behavior. For example, in *Earnest v. Genessee Cty., Michigan*, the court held that a takedown maneuver was appropriate where a DUI suspect swung his arm in an officer's direction and refused to provide his hands to officers so they could handcuff him. 841 F.App'x 957, 959-60 (6th Cir. 2021). And in *Burchett v. Kiefer*, the court held that brief force used to subdue a resistant defendant who "twisted and turned," when officers tried to handcuff him, was reasonable. 310 F.3d 937, 944 (6th Cir. 2002). In other cases, courts have held that takedown maneuvers violated clearly established rights where, for example, a suspect was restrained by both arms and could not, or refused to, put one arm behind his back, and "jerked away" after the arresting officer shouted in his ear, *McCaig v. Raber* 515 F. App'x 551, 553-55 (6th Cir. 2013), or where officers used a "straight arm-bar takedown maneuver" on a suspect who, without additional active resistance, refused to exit her car as quickly as officers desired. *Byrne v. Bero*, No. CIV. 13-15118, 2015 WL 3476956, at *5 (E.D. Mich. June 2, 2015).

Viewed in the light most favorable to the Plaintiff, Davis was being arrested for loitering and failure to produce identification—a low-level violation of a City ordinance, and a non-violent crime. Davis was also

unarmed, posing an immediate threat to neither Officer Walleman nor the officers who assisted with arresting Davis, nor anyone else. Officer Walleman testified that when he approached Davis, Davis made no attempt to run or flee. ECF No. 26-5, PageID.601-602. Nor did Davis exhibit any threatening behavior towards Officer Walleman at any time. Finally, Davis was calm and cordial throughout the entire encounter, consistently referring to Officer Walleman as "sir," and speaking in a normal tone of voice. ECF No. 24-8, at 01:36-01:42. However, along with actively refusing to put both of his hands behind his back, Davis appears to have backed away from Officer Walleman and turned his body to prevent Officer Walleman from pulling Davis' left arm behind his back. *Id.* at 01:40-57. Given the lack of Sixth Circuit precedent demonstrating otherwise, the Court is unable to conclude that it was clearly established, at the time of the incident in question, that the "reverse escort takedown maneuver" Walleman employed in subduing Davis in response to the sort of behavior Davis was exhibiting violated a clearly established constitutional right.[3] As the Sixth Circuit has explained, police officers

---

[3] Despite the existence of Michigan case law suggesting a right to resist unlawful arrest, *See generally*, *People v. Moreno*, 491 Mich. 38, 57 (2012), the Court has been unable to locate any decision, reported or otherwise, in which that principle was used to overcome qualified immunity in a suit to recover damages for the application of allegedly excessive force, rather than as a defense to a charge of resisting arrest. Therefore that right, to the extent it exists, does not disturb the Court's conclusion on the qualified immunity issue absent additional clarifying precedent.

are "not liable for bad guesses in grey areas; they are liable for transgressing bright lines." *Rudlaff*, 791 F.3d at 644 (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Therefore, Officer Walleman is entitled to qualified immunity on Davis' excessive force claim.

### iii.   Davis' First Amendment retaliation claim may proceed.

Davis argues that he engaged in constitutionally protected speech when he questioned Officer Walleman's legal authority to require him to produce identification, and quickly suffered an adverse action– arrest – in retaliation. ECF No. 26, PageID.554. Government officials may not subject an individual to retaliation for exercising their First Amendment rights. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To prove a First Amendment claim of retaliation, a plaintiff must show that: (1) he or she engaged in protected conduct; (2) the defendant took an adverse action against the plaintiff that would deter a person of ordinary firmness from continuing to engage in the conduct; and (3) a causal connection exists between the protected conduct and the adverse action–that is, the adverse action was motivated, at least in part, by the plaintiff's protected conduct. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1721 (2019). In the context of a retaliatory arrest, a plaintiff must plead and prove the absence of probable cause to make the arrest. *Id*. at 1724-26.

As this Court and the Sixth Circuit have recognized, citizens engage in protected First Amendment speech when they criticize police officers' behavior in citizen encounters. *Cain v. City of Detroit*, No. 12-15582, 2016 WL 6679831, at *6-7 (E.D. Mich. Nov. 14, 2016)(plaintiff engaged in protected speech when he criticized how police officers treated him during traffic stop)(citing *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010)). And an arrest is an adverse action that could deter a person of ordinary firmness from exercising his or her rights. Moreover, as explained above, a reasonable jury could conclude that Davis was arrested without probable cause, satisfying the requirement imposed by *Nieves*. Finally, given the fact that the encounter escalated to arrest—for a low level crime–very quickly after Davis began to question Officer Walleman's authority to request Davis' identification, a reasonable jury could conclude that the arrest was motivated, at least in part, by a desire to retaliate against Davis' criticism.

As to qualified immunity, the Sixth Circuit has explained that a person's "right to be free from retaliatory arrest after insulting an officer was [in 2005] clearly established." *Kennedy v. City of Villa Hills*, Ky., 635 F.3d 210, 219 (6th Cir. 2011). A reasonable officer would have known that arresting a person in response to their questioning of the officer's authority would violate that person's First Amendment right to question the police and be free from retaliatory arrest for doing so. *See Cain*, 2016 WL 6679831, at *7. Therefore, qualified immunity will turn on the factual

question of whether or not Officer Walleman had retaliation as a motive, and summary judgment will be denied. *See Kennedy*, 635 F.3d at 219 (affirming denial of summary judgment on the basis of qualified immunity and explaining that "once the factfinder determines that protected speech motivated the arrest, the illegality of the arrest becomes readily apparent.")(internal marks and citation omitted).

### iv.   Davis cannot establish that he was subjected to disparate treatment based on his race

Although Davis fails to address his federal racial discrimination claim in his Response, and therefore has arguably abandoned it,[4] the court will nonetheless address it because Davis' ELCRA claim, which Davis does address, requires the same analysis.[5] To prevail on a § 1983 claim of racial discrimination under the Fourteenth Amendment, a plaintiff must show that the defendant's actions had "a discriminatory effect and that it was motivated by a discriminatory purpose." *Bey v. Falk*, 946 F.3d 304, 319, (6th Cir. 2019)(citation omitted). A plaintiff can

---

[4] *Hicks v. Concorde Career Coll.*, 449 F.App'x 484, 487 (6th Cir. 2011) (district court properly declined to consider merits of a claim when plaintiff failed to address it in a response to a motion for summary judgment); *EEOC v. Home Depot USA*, No. 4:07CV0143, 2009 WL 395835, at *17 (N.D. Ohio Feb. 17, 2009)("when a plaintiff asserts a claim in a complaint but then fails to delineate that claim in her brief in opposition to summary judgment, that claim is deemed abandoned.").

[5] *Nelson v. City of Flint*, 136 F. Supp. 2d 703, 713 n. 12 (E.D. Mich. 2001)(Rosen, J.)(explaining that elements of a cause of action for race discrimination under ELCRA are same as elements necessary to establish liability under § 1983.).

prove discrimination through "direct evidence . . . or inferences can be drawn from valid relevant statistical evidence of disparate impact or other circumstantial evidence." *U.S. v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997).

Although Davis does not support his federal equal protection claim, he argues, regarding his ELCRA claim, that Officer Walleman allegedly admitted to racial discrimination shortly after Davis' arrest. ECF No. 26, PageID.563. Davis argues that once his father arrived and began speaking with Officer Walleman about the reason for Davis' arrest, Davis' father said to Officer Walleman "[i]f he was white, you wouldn't do it." ECF No. 24-8 at 10:13-10:18; Delbert Davis Aff., ECF No. 26-6, PageID.606. To which Officer Walleman responded "[a]bsolutely, 150 percent." *Id*. Davis characterizes this response as an admission of discriminatory purpose: that Walleman was admitting that, if Davis had been white, Davis "absolutely" would *not* have been investigated or arrested. This conclusion, based on the Court's having viewed the video of the interaction, relies on a misunderstanding of Mr. Delbert Davis' question, and/or Officer Walleman's response. When Davis' father suggested that Officer Walleman would not have stopped Davis if he was white, is clear that Officer Walleman's response of "[a]bsolutely, 150 percent" intended to convey certainty that *even if* Davis had been white, Officer Walleman would have still conducted the stop, rather than

28

intended as a naked admission of racial bias.[6] Though evidence on summary judgment must be viewed in the light most favorable to the nonmoving party, "summary judgment does not allow, much less require that [courts] draw strained and unreasonable inferences in favor of the nonmovant." *Fox v. Amazon.com, Inc.*, 930 F.3d 415, 425 (6th Cir. 2019)(internal marks and citation omitted).

Additionally, in Davis' testimony, he references two prior incidents where white males were in the parking lot after closing, and police made no attempt to approach them. While closing one night, Davis saw a white male sitting outside and "[i]t didn't look like he was waiting on anything, and he was still there when [Davis] had closed [Firehouse Subs]." ECF No. 24-6, PageID.447. No police officers approached the man. The second incident Davis references occurred another night while Davis was waiting for his dad to arrive and "there were people in the parking lot playing with cars and doing random stuff to cars and dangerous things. No cop cars showed up . . . nobody approached them, and they were also White." *Id*.

Davis claims that because he saw police cars drive past during both incidents and make no attempt to approach the individuals, Officer Walleman's decision to approach Davis was made, in part, due to Davis'

---

[6] Indeed, Mr. Delbert Davis appears to have asked Walleman: "If he was white *would you do it*?" ECF No. 24-8 at 10:13-10:14, to which Walleman responded: "Absolutely, 150 percent." *Id.* at 10:15-10:17

race. *Id.* at PageID.448. However, Davis provides no evidence to indicate that Officer Walleman was the officer who drove past during either prior incident and failed to make a stop. *Id.* at PageID.447-48. Nor has Davis provided any statistical evidence of a broader pattern of discrimination. In the absence of either form of evidence, Davis has not adequately supported his claim for racial discrimination, and Defendant Walleman is entitled to summary judgment.

## B. State law claims against Officer Walleman

In his Complaint, Davis asserted that Officer Walleman (1) failed to perform certain ministerial duties; (2) engaged in malicious prosecution; (3) committed gross negligence; (4) conducted a false arrest and false imprisonment; (5) caused intentional infliction of emotion distress; and (6) committed racial discrimination against in violation of ELCRA. However, in his Response to Defendants' summary judgment motion and at oral argument regarding that motion, Davis indicated that he would only seek to advance state law claims for (1) false arrest and false imprisonment, and (2) racial discrimination in violation of ELCRA. ECF No. 26, PageID.524.

### i. Davis' false arrest and false imprisonment claim may proceed

Davis alleges that he was subjected to a false arrest and false imprisonment due to a lack of probable cause or reasonable suspicion supporting his arrest. Conversely, Officer Walleman argues that,

regardless of whether probable cause to conduct the arrest existed, he is entitled to statutory immunity under Michigan law.

Under Michigan law, false arrest and false imprisonment are not distinct torts when the imprisonment arises out of an allegedly false arrest by police officers. *Peterson Novelties, Inc. v. City of Berkley*, 259 Mich. App. 1, 17-18 (2003). To prevail on a claim of false arrest or false imprisonment, a plaintiff must show that the arrest was not legal—that is, it was made without probable cause. *Id.* (citing *Tope v. Howe*, 179. Mich.App.91, 105 (1989)). If the arrest was legal, a false arrest or imprisonment claim cannot be sustained. *Id.*

As discussed in the Court's analysis of Davis' Fourth Amendment claim, the presence of probable cause to arrest Davis for refusal to produce his identification, or for loitering, depends on a genuine issue of material fact as to whether Officer Walleman possessed reasonable suspicion to conduct a *Terry* stop, and whether that reasonable suspicion was dispelled during the interaction. Therefore, because a reasonable jury could find that Officer Walleman lacked probable cause to conduct the arrest due to an absence of reasonable suspicion to conduct the investigatory stop and demand that Davis produce his identification in the first place, so too could a reasonable jury find that Davis was subjected to a false arrest and imprisonment.

Officer Walleman argues that he is entitled to immunity under the Michigan Governmental Tort Liability Act, Mich. Comp. Laws §

691.1407. Michigan law immunizes government officials from liability if: (1) the acts were taken during the course of employment and the employee was acting, or reasonably believed he or she was acting, within the scope of his or her authority, (2) the acts were undertaken in good faith, or were not undertaken with malice, and (3) the acts were discretionary. *Odom v. Wayne Cty.*, 482 Mich. 459, 461-62 (2008). Discretionary acts are those that "require personal deliberation, decision and judgment." *Id.* at 476 (citation omitted).

Walleman arrested Davis within the scope of his duties and authority as a police officer, and a police officer's decisions regarding how to proceed in police-citizen interactions are discretionary. *See Norris v. Lincoln Park Police Officers*, 292 Mich. App. 574, 579 (2011). However, because "malice may be inferred from absence of probable cause" in the context of false arrest and malicious prosecution claims, *Miller v. Sanilac Cty.*, 606 F.3d 240, 254 (6th Cir. 2010), and because, for the reasons discussed in III.A.i, *supra*, a reasonable jury could conclude there was no probable cause to arrest Davis, his state tort claim for false arrest and false imprisonment may proceed.

### ii.   Davis cannot establish racial discrimination in violation of ELCRA

Claims of racial discrimination made under ELCRA are analyzed using the same framework as § 1983 claims for racial discrimination. *Nelson v. City of Flint*, 136 F. Supp. 2d 703, 713 n. 12 (E.D. Mich.

32

2001)(Rosen, J.). Therefore, for all the same reasons discussed in the Court's analysis of Davis' federal claim of racial discrimination, Defendant Walleman is entitled to summary judgment on Davis' state law racial discrimination claim.

## CONCLUSION

For all the reasons set above, Defendant's Motion for Summary Judgment (ECF No. 24) is **GRANTED IN PART AND DENIED IN PART**. Summary judgment is **DENIED** as to Davis' First Amendment retaliation claim; Fourth and Fourteenth Amendment claims for wrongful investigation, arrest, and imprisonment; and his state law claims for false arrest and false imprisonment. Summary judgment is **GRANTED** as to Davis' Fourth and Fourteenth Amendment claims for excessive force and discriminatory treatment; and his state law ELCRA claim for racial discrimination.

**SO ORDERED**, this 31st day of March, 2022.

BY THE COURT:


s/Terrence G. Berg
TERRENCE G. BERG
United States District Court Judge