UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LOGAN DAVIS,

Plaintiff,

vs.

Case No. 20-11499
Hon. Terrence G. Berg

JEREMY WALLEMAN, et al,

Defendants.
_______________________________/

**MOTION FOR SUMMARY JUDGMENT**
**VIA ZOOM VIDEOCONFERENCE**

BEFORE THE HONORABLE TERRENCE G. BERG
United States District Judge
Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan 48226
Wednesday, February 16, 2022

APPEARANCES:

For the Plaintiff Logan Davis:
BRANDON MCNEAL
Robinson & Associates
28145 Greenfield Road
Suite 100
Southfield, Michigan 48076
248-423-7234

For the Defendant Jeremy Walleman, et al:
NATHAN D. PETRUSAK
O'Reilly Rancilio P.C.
12900 Hall Road
Suite 350
Sterling Heights, Michigan 48313
586-726-1000

To obtain a certified copy of this transcript, contact:
Linda M. Cavanagh, CSR-0131, RPR, CRR, RMR, CRC, RDR
Official Court Reporter
(313) 234-2616 • www.transcriptorders.com

TABLE OF CONTENTS

Page

MOTION FOR SUMMARY JUDGMENT:

Motion by Mr. Petrusak....4
Response by Mr. McNeal....20
Reply by Mr. Petrusak.... 30

EXHIBITS

| Identification | Offered | Received |
|---|---|---|
| NONE | | |

Detroit, Michigan

Wednesday, February 16, 2022

_ _ _

(Proceedings commenced at 2:06 p.m., all parties present via Zoom videoconference)

THE COURT: Well, good afternoon everyone.

And so Mr. Weissberg, would you be kind enough to call the case?

THE LAW CLERK: Hear ye, hear ye, hear ye, the United States District Court for the Eastern District of Michigan is now in session, the Honorable Terrence G. Berg presiding.

All ye having business before the Court draw near, give attention and ye shall be heard. God save the United States of America and this Honorable Court.

The Court calls Case No. 20-11499, Logan Davis versus Jeremy Walleman.

Counsel, please place your appearances on the record.

MR. McNEAL: Good morning, Your Honor. Good morning to all the staff. Brandon McNeal, P number 81300, appearing on behalf of Plaintiff Logan Davis.

THE COURT: Mr. McNeal.

MR. PETRUSAK: Good afternoon, Your Honor. Nathan Petrusak appearing on behalf of the City of Sterling Heights and Officer -- and Sterling Heights Police Officer Jeremy Walleman.

THE COURT: And good afternoon to you, Mr. Petrusak.

So before we get started, let me just thank our court reporter here. We have Ms. Linda Cavanagh. We're very grateful for her service. She's taking everything down during this Zoom hearing that we're having.

We are here for purposes of hearing oral argument on the defendant's motion for summary judgment in this case. And so Mr. Petrusak, that's your motion and so I'd be happy to allow you to address the Court. We'll give each side about 15 minutes or so to present their argument and then I'll give you another five minutes in rebuttal.

So go ahead, sir.

MR. PETRUSAK: Thank you, Your Honor.

I'm sure that the Court has read the parties' briefings and is well versed on the issues that are presented today so I don't want to belabor too many of the factual points of this case. Certainly I can delve into them if the Court would like me to do so, but suffice it to say we're here today on -- on the City and Officer Walleman's motion for summary judgment of plaintiff's Complaint.

Plaintiff's Complaint arises out of an incident that occurred in Sterling Heights out in -- in the evening hours, about 9:45 p.m., out in front of a Firehouse Subs in a closed commercial plaza. The businesses closed at 9:00 p.m. The parking lot was empty. Plaintiff was -- or I should say a

shadowy figure of some -- of some form was observed by Officer Walleman standing in front of a -- under the awning of a darkened Dickey's Barbecue on that evening.

Officer Walleman had knowledge that there had been a break-in in the past in that particular commercial plaza, and he made the decision to go and investigate the presence of that shadowy figure in front of that -- in front of those closed businesses, and upon pulling up to -- to that shadowy figure in the parking lot did discover that it was, in fact, plaintiff at that time. The --

THE COURT: Okay. So let me just stop here. So, of course, we do have videos here. So there's a video that was taken from the plaintiff's cell phone. There was a video that was also taken from the officer's dashcam. I have seen those, I've watched them several times, so I know basically what happened as much as one can discern from looking at those videos.

And I don't really like the term "shadowy figure." I don't think it's really totally accurate here. It may be accurate with respect to what the officer saw before he got within view, but from the video it's -- he's not a shadowy figure. You can tell essentially it's a young man. You can see what he's wearing. It's relatively well lit. Now, whether it's perhaps more well lit from the video perspective than with the naked eye, I don't know, but from the video perspective, I

don't think that's an accurate description.

But at any rate, yes, we know what happened, and let me ask you this question. Do you agree that if there was no probable cause for loitering, then the arrest itself would be objectively unreasonable?

MR. PETRUSAK: I -- I would not agree with that, Your Honor. I think there's -- there's at least two other independent bases that would -- that would serve to establish probable cause for the arrest of plaintiff. The first of those would be under 35-19(B) of the City's Code of Ordinances which makes it a misdemeanor offense for willfully refusing to provide identification to an officer while he was investigating plaintiff's act of loitering.

THE COURT: Well, now, that -- that statute though requires that the officer have reason to believe that some sort of an infraction or violation is occurring, does it not?

MR. PETRUSAK: Correct. And Officer Walleman had reasonable suspicion to believe that what -- and I -- and I agree with the characterization. It was -- it was a shadowy figure that was observed from when he was on the roadway peering across the median on Van Dyke, and so he observes a shadowy figuring loitering in front of these closed businesses and he goes to investigate. He has reasonable suspicion to do so based on the time of day, the lighting conditions, the closed businesses, the empty parking lot, the prior break-in in

the plaza. So he goes and he is investigating a possible instance of loitering in front of these -- these -- these businesses, and he's testified that he believed that the person might be acting as a lookout for a potential break-in.

So he has reasonable suspicion to go and stop plaintiff. Plaintiff testified on three separate occasions that Officer Walleman was -- it was reasonable for Officer Walleman to come and stop and investigate what was going on. There's -- so he -- the plaintiff is not significantly disputing that there was not reasonable suspicion supporting this stop.

At that point, under the loitering ordinance, because an alarm has been created, the loitering ordinance provides that the law give the person an opportunity to dispel that alarm by, amongst other things, identifying himself, which he gave plaintiff the opportunity to do, and plaintiff consistently refused to do so by anything other than saying that his name was Logan and refusing to provide a last name or any identification. That would --

THE COURT: Well, just -- just a moment. So you say he didn't provide any identification. You're right that he didn't provide his last name, that's clear. And I recognize that the -- the level of responsiveness of Mr. Davis was not as, let's say, cooperative as it could have been, and if he had given his last name, that would have been good in terms of

perhaps allaying some of the officer's concerns. But what he says he did and what is arguably discernible from the video is that he showed him his employee tag, his employee I.D. tag and also his shirt.

Now, he says, and it's true, I don't think you dispute, that he was working at that time at the store two doors over, the Firehouse Subs. That's -- no one disputes that, right?

MR. PETRUSAK: No, Your Honor, no one disputes that.

THE COURT: Okay. So he really is, in fact, an employee of that store which had just closed about 40 minutes earlier, right?

MR. PETRUSAK: Correct. Officer Walleman doesn't know that at the time, but that's correct.

THE COURT: Well, he told him that.

MR. PETRUSAK: He did tell him that, but he has no -- he has -- hasn't been able to verify that.

THE COURT: He told him that, and then he says he showed him his shirt and showed him his I.D. badge.

MR. PETRUSAK: He says that he showed it to them. He does not say that -- he does not say that Officer Walleman actually saw that he was wearing a Firehouse Sub shirt or saw a Firehouse Subs name badge. It's -- it's undisputed in the case based on Officer Walleman's testimony that he did not see that plaintiff was wearing a Firehouse Sub shirt or a Firehouse Subs

name badge. He acknowledges that he attempted to show him his shirt, but it's -- as to what was written on that shirt, Officer -- the -- there's no evidence to the contrary that Officer Walleman did not see that it was specifically a Firehouse Sub shirt or a Firehouse Subs name badge.

THE COURT: Well, the plaintiff is not in a position to know what the officer saw or did not see with the officer's eyes. The plaintiff says he showed it to him and the officer says he didn't see it. Isn't that a dispute of fact that could make a difference with respect to whether or not there was probable cause to go forward and whether or not there was a basis to dispel the concern about loitering?

MR. PETRUSAK: I -- I don't think it's -- I don't think it's a disputed question of fact because it -- it amounts to plaintiff's speculation that because he attempted to show Officer Walleman his shirt, that Officer Walleman must have seen that he was wearing a Firehouse Subs shirt.

But on the video, in -- in addition to the affidavit submitted and his deposition testimony on the video, there's numerous times that Officer Walleman states on the video that he didn't know that he worked at Firehouse Subs, including during his interactions with plaintiff's father who arrived at the scene later when he -- I think he says on two separate times that he didn't know that plaintiff worked at Firehouse Subs. So there's -- there is no evidence on the video or in

the deposition testimony or anywhere that Officer Walleman actually saw that it was a Firehouse Subs shirt. It's -- that's -- it's simply plaintiff's speculation at this point that he must have seen it.

But we look at -- we look at probable cause and reasonable suspicion and things like that from what the officer knew at the time of the arrest and what --

THE COURT: Now, when you -- when you look at the video, it does appear that the plaintiff is attempting to show the officer something. And also when you look at the video from the plaintiff's cell phone, even though it's somewhat shaky, it appears that the officer is looking at the plaintiff's chest, and he says -- when he asks him for I.D. and he says, "I don't have to," and he says, "Well, why should I believe that?," that's when this occurs, that he seems to show him his -- his shirt and the officer says, "Okay, okay, but I still need to see your I.D." Now, why couldn't a jury interpret that and -- and view that as proof that the plaintiff did show him his shirt and that the police officer did see it because he acknowledged it by saying "okay"?

MR. PETRUSAK: The -- again, I think that that would -- any determination in that regard would rely on them to speculate that that was what he meant by the statement "okay."

And in terms of the -- the officer's sort of looking in that -- the chest area, Officer Walleman is giving up quite

a few inches to -- to plaintiff. He's -- he's -- his -- his -- his face and head area is somewhat, you know, chest level as -- as it is in comparison to plaintiff's stature. And so I think that they would -- they would be -- they would simply be speculating that that is the case and when the evidence showed -- when there's no affirmative acknowledgement whatsoever, and, in fact, it's -- it's -- he's expressly stated, "I didn't see that he was wearing a Firehouse Sub shirt."

And I don't necessarily think that even if he had been wearing a Firehouse Sub -- well, I should say even if Officer Walleman had observed him wearing a Firehouse Sub shirt at the time of the arrest or just prior to the arrest, that that would be -- that that would make it -- that that would eliminate the probable cause that would exist, one, for loitering because -- just because he may, in fact, work at Firehouse Subs, yes, that -- that offers some explanation for why he's out in front of the plaza, but it doesn't explain why a plaintiff -- why the plaintiff who just got off work at Firehouse Subs is not standing waiting for his ride in front of Firehouse Subs where the awning is -- is more illuminated and the -- and the interior dining room is illuminated, but is standing a few doors down in front of the Dickey's Barbecue next to an electronics shop.

THE COURT: Well, I think -- I -- I -- I'm sorry, but

that -- I don't think that is really very -- very believable or plausible to me. You're talking about a young man who is two doors down in a very small strip mall from the place where he works, and you're saying that it's not reasonable if you had actually been able to see his Firehouse shirt, that that wouldn't allay suspicion about him as a Firehouse Subs employee? I don't think that makes any sense frankly.

MR. PETRUSAK: It -- it might -- it might have, but that's -- that's where the conjecture comes in. If he -- if he shows him the Firehouse -- if -- if he had shown him the Firehouse Subs shirt and Officer Walleman had seen the Firehouse Sub shirt but the plaintiff had continued in his refusals to provide a last name, to provide identification, to be evasive in terms of what his identity was, there's a lot of different factors that go into determining whether or not the alarm by -- created by his presence has been dispelled for purposes of the loitering ordinance.

But I also don't -- I also don't think we were talking about the probable cause that also existed under 35-19(B) for not providing identification as well as state law, MCL 750.479, which is an obstruction statute which makes it a -- which makes it a crime for a person to knowingly and willfully failing -- failing to comply with an -- with an order of an officer who's investigating a possible crime that includes an order to produce identification. It is -- it's

undisputed that -- that plaintiff had identification on him. He was ordered to produce it by Officer Walleman and he refused that command to produce it.

THE COURT: Doesn't he have to have reasonable suspicion that the person's involved in some kind of criminal activity in order for that -- for that command, if you will, to be a lawful command to produce I.D.?

MR. PETRUSAK: Certainly. Absolutely. There has -- there has to be --

THE COURT: All right. So in other words, so in other words, if he does not have reasonable suspicion, then the officer cannot just walk up to citizens willy-nilly and say, "Show me your I.D."

MR. PETRUSAK: Of course.

THE COURT: And their failure to do so is not a crime, right?

MR. PETRUSAK: That -- that would -- that would be a hundred percent. If it's -- if it's a first tier consensual contact, the officer can walk up, he can ask him questions, ask him to identify themselves and they can say no. But once we get -- but once we get to a point where there's a reasonable suspicion to believe that a crime is possibly being committed, the -- the Supreme Court decided in *Hiibel* that you have to produce identification, you're required to identify yourself.

And we maintain in this case that based on the

totality of the circumstances, it's not to say that any -- that any one factor is dispositive of it. As the Court -- as cases have pointed out, you know, certain fact -- individual instances of seemingly innocent contact -- activity, when put together, can rise to the level of a reasonable suspicion.

You have -- so in this case you have a closed commercial plaza and it's -- the business, it's empty. It was closed an hour earlier. Plaintiff by his own admission acknowledges that he was there later that night than he typically is, and he only -- and he usually gets picked up by his father right away, he's usually not standing outside.

Officer Walleman knew that there had been a prior break-in in the plaza. And while I -- while I understand that he was just standing a few doors down from where he worked, it does make -- it does make a difference in the officer's mind when someone says, "I work at Firehouse Subs, I'm waiting for my father to come pick me up," but you're not standing in front of Firehouse Subs where it's -- where it's brighter; you're standing a few doors down. And that Firehouse Subs was closer to where the driveway was that someone would pull into to pick him up. So there was a number of different factors that all -- that all go into this creation of the reasonable suspicion to stop him on suspicion of -- on suspicion of loitering. And at that point --

THE COURT: Well, I still -- I think -- I think the

problem that you have is that if it -- with -- with this factual dispute about whether the officer was shown the fact that he was wearing a Firehouse Subs shirt and whether that could dispel any concern about loitering and therefore dispel any reasonable suspicion of a crime, then the jury might have problems with the fact that the command to show your I.D. was justified or that the plaintiff's response in not wanting to show the I.D. was not justified, and so I think that's part of the problem here.

But let me go on to the question of the force that was used here. So do you take the position that it's objectively reasonable for an officer to use force and -- and conduct a full custodial arrest when a citizen refuses to present I.D.?

MR. PETRUSAK: The -- the contention would be is that when a -- when a person has been -- has been ordered to -- when there's reasonable suspicion for a stop and the officer has ordered you to produce identification and you're -- and has -- you -- you have failed to do so and the officer goes to place you under arrest because -- because -- whether it's a -- whether it's resisting, whether it's under the resisting ordinance, whether it's under the loitering ordinance, what have you, when he goes to place a person under arrest and that person actively pulls away from the officer, pulls his hands away from the officer, the officer is allowed to use reasonable

force under the -- under that circumstance to effectuate an arrest of plaintiff.

THE COURT: So this is a completely unarmed plaintiff who had not -- who had not threatened the officer, had not raised an arm to the officer, had done nothing to present any danger and was -- was essentially tackled to the ground because he did not produce his I.D., and -- and your -- your position is that that's objectively -- an objectively reasonable use of force?

MR. PETRUSAK: It is, Your Honor, because it -- it's not just -- it's not about whether he's threatening the officer, whether he's armed or anything else. It's active resist -- you know, the -- the act of physical resistance includes physically -- physically struggling or -- or disobeying an officer's commands.

In this particular case Officer Walleman instructed him to put his hands behind his back, and he went to secure his hands behind his back and plaintiff began pulling away and refusing to give his -- and to allow his hands to be handcuffed. His active resistance is evident from the video. At that point Officer Walleman was allowed to use reasonable force in order to secure him.

THE COURT: Well, I don't think either side briefed this, but are you familiar with the Michigan State Supreme Court case of *People vs. Moreno*?

MR. PETRUSAK: I am not.

THE COURT: So basically in that case the Michigan Supreme Court indicated that as much as it might not seem what you might expect, that a citizen does have the right to resist an unlawful arrest, and that's at 491 Michigan 38, 2012 case.

How -- how -- how should something like that factor in here? You know, if -- if it turns out that there was no probable cause for loitering here, and -- and I don't -- I don't dispute that -- it's -- it's clear on the video that Mr. Davis does not give him his other arm. So Officer Walleman has control of one of his arms, and the plaintiff does not release his cell phone which he's holding and trying to videotape this and he does not give his hand, and he -- he clearly is -- he's holding a conversation with the officer saying, "You don't have the authority to do this," et cetera. But how do we factor in this Michigan law that seems to say that a person can resist an unlawful arrest?

MR. PETRUSAK: Well, I don't -- I don't believe it was an unlawful arrest, Your Honor. I think it was -- it was -- it was one of two things. I think it was either an arrest that was supported by probable cause or it was an arrest that was supported by -- by arguable probable cause, thereby entitling the officer to qualified immunity. And so I don't think that this -- that this is a circumstance where -- that the plaintiff was justified in -- in resisting Officer

Walleman's attempts to secure his hands.

THE COURT: Okay. But even -- I -- I think we're on the same page though as far as how the law works here, which is that the officer has to have a reasonable basis to believe that there's a crime occurring to even ask him to see their I.D., right?

MR. PETRUSAK: Correct, yeah. Well, you have to have reasonable suspicion in order to conduct a *Terry* stop, and then once you have that reasonable suspicion, then, yes, then you have -- the -- the person has -- has to identify themselves as a matter of course.

THE COURT: And so, well, what would you say to the question of whether under these facts it might be possible for a jury to conclude that the plaintiff's statement that he worked at Firehouse Subs, the showing of the shirt of Firehouse Subs, the showing of the badge of working for Firehouse Subs would have been sufficient to dispel any concern about loitering, at which point the questioning for I.D. would not be justified?

MR. PETRUSAK: Well, it's -- it's -- it's not just the questioning for I.D. Yes, that's a component of it, but certainly he asked him for -- to -- for what his last name was, and he -- and plaintiff asked him why, and he wanted -- and the officer wanted to know and he refused to tell him why. So it's not just the driver's license. It's the -- it's the refusal to

give the last name because a person can say, "Well, my name is John, my name is Steve." That doesn't do an officer any good. An officer has no way of verifying who that person is based solely on a first name. And if by some chance he just lets that person go and a break-in is occurring, well, all his -- all his report would say is, "Well, I talked to someone named Logan." "Well, Logan who?" "Oh, I didn't get a name."

A first name is not -- is not sufficient for -- to identify yourself, and the -- the -- so I think that a jury could -- I think that a jury could find that not providing -- not just identification but not providing a last name is not identifying yourself. It's not -- it's not enough to say, "My name is Logan and I work with Firehouse Subs and here's my shirt." You have to give a last name.

THE COURT: Right. I understand. I understand. But we're -- also when you talk about the totality of the circumstances, those circumstances are much broader than what you just described because they have the plaintiff standing in the very near vicinity to the Firehouse Subs. They have his statement that he did work and just got off from Firehouse Subs and that he was waiting for his dad, which frankly is pretty normal and not at all suspicious to have a young person saying that they just got off work and they're waiting for their dad.

But at any rate, I -- I hear what you're saying here and I -- and I don't disagree with you with respect to your

understanding of -- of the law. It's just a question of how these facts relate to that law. So I'll give you an opportunity to come back after we hear from Mr. McNeal here.

So Mr. McNeal, you may proceed.

MR. McNEAL: Thank you, Your Honor.

There are a few points that I would like to address in regard to the arguments made by defense counsel. In terms of reasonable suspicion, it's our contention that there was never reasonable suspicion. We look at the facts in the light most favorable to the non-moving party.

What we have here is a 18-year-old high school student waiting for his dad to pick him up after work. It's 45 minutes past closing time and Logan Davis is in full -- has his work badge as well as his work shirt on. And any reasonable suspicion that -- arguable reasonable suspicion that Officer Walleman had during the initial encounter, all of those so-called alarm bells were dispelled when Logan provided him with his name as well as unzip his shirt and provided Officer Walleman the opportunity and ability to view that shirt. Now, obviously Officer Waterman [sic] -- Walleman contends that he didn't see the shirt, but all the circumstantial evidence suggests that he did. The Firehouse -- or the Dickey's awning was located directly behind the plaintiff, and the officer's headlights were shining upon Officer Walleman as well as Logan Davis.

And I think it's, you know, very important to go back to Officer Walleman's report. Officer -- Officer Walleman's report doesn't mention any of the so-called alarm bells that defense counsel now wants to rely on. Defense counsel now wants to rely on the fact that there were burglaries years prior to -- to this encounter with the plaintiff, and then he wants to attach himself to those burglaries by saying that he had knowledge of those, but none of that is included in his report.

The only thing that's included in his report is that he seen a subject, a large statured subject who was possibly acting as a lookout. Well, if he was acting as a lookout, what were Logan Davis's actions that justified that? Logan Davis was just standing in front of the -- under the Dickey's awning. It was raining, it was dark at night.

THE COURT: Okay. So Mr. McNeal, let me ask you a little bit about that. So you've described a lot of the facts, and -- and these facts I think are not incorrect based on what the record is here. But there were other things that you haven't mentioned. So it is true that Mr. Davis did not give his last name and also refused to provide any kind of I.D. Don't those facts in this case add to the officer's concern? An officer sees someone standing outside a business, does not really know what it is, he's suspicious perhaps because of prior break-ins, he wants to ask some questions. And how do

you deal with the fact that Mr. Davis's actions in not providing his last name and in not providing an I.D. may have made the officer more suspicious?

MR. McNEAL: Well, Your Honor, Officer -- Officer Walleman's suspicions aren't reasonable because Mr. -- Officer Walleman's suspicions (Speaker's screen frozen).

THE COURT: Let's see. I think we may have lost Mr. McNeal. I'm not -- not hearing you, Mr. McNeal. So Mr. McNeal, if you can hear me, you might want to try to disconnect and reconnect because we can't hear or see you. Okay. Now we can see you.

MR. McNEAL: I apologize, Your Honor. I'll back up in case something was missed.

Going back to the statute, the statute provides that the officer should afford the person the opportunity to dispel any alarm or concern by requesting him or herself to identify himself. It -- the statute doesn't say provide identification. The State of Michigan is not a stop and I.D. state, Your Honor, and what defense counsel is trying to do is trying to use this statute to make the State of Michigan or -- or this law into a stop and I.D. state.

Any concern that he had should have been dispelled when he did identify himself as well as unzipped his jacket, showed him his work badge as well as his work shirt, and also identified that his father is on his way to pick him up. So

that should have dispelled any reasonable officer to -- any alarm bells that were there should have been dispelled at that point. There's nothing more that Logan was required to do under the law.

Now, could he have done more to identify himself? Surely, but the law doesn't require that Logan provide something that he's not legally required to even have. Logan didn't --

THE COURT: Well, I think -- I think part of the -- part of the problem is the kind of identification of himself that he provided initially. By only providing his first name was not the kind of identification that would have enabled the officer to follow up and see if there was anything about this individual's background, for instance, by doing a criminal history check or some other thing on the computer in his vehicle. By just having the first name, he was not really in a position to dispel his -- his concerns.

Now, I agree that the -- as I was questioning your -- your opposing counsel there about the issue of the Firehouse shirt that he was wearing and the Firehouse I.D. badge. But if you -- if you look at it from the perspective of the officer, if he was not able to see those two items and he also had Mr. Davis not providing him with his last name and then also not being willing to give him his -- his identification, what -- what is a reasonable officer supposed to do if a citizen just

refuses to give their identification under circumstances where the officer does have reasonable suspicion of some kind of potential ordinance violation?

MR. McNEAL: Your Honor, we would contend that -- I would agree with you that if there was reasonable -- reasonable suspicion, that under those circumstances, that is a potential issue that we may have. The issue always comes back to did Officer Walleman have reasonable suspicion to believe that a crime was being committed, is about to be committed or had been committed. None of those things existed in this case. Therefore, his refusal to provide identification was lawful.

And -- and just to touch back on some of the claims that Defendant Walleman makes, that he couldn't see those, Your Honor, those are simply -- when you look at the circumstantial evidence surrounding the -- the encounter, Officer Walleman was no more than two or three feet in front -- directly in front of Logan Davis. And you can see on the video that Logan Davis's -- Logan Davis surely unzips his hoodie allowing the -- allowing his work badge and logo to be shown. So the inference and the circumstantial evidence is strong that Officer Walleman did, in fact, see defendant or plaintiff's work shirt as well as his work badge.

So under those circumstances, there isn't -- there is no reasonable suspicion, but I would agree with you, Your Honor, that if there was reasonable suspicion, then at that

point he could request identification.

THE COURT: Let me ask you about your First Amendment claim here. What -- in what sense is Mr. Logan Davis even involved in First Amendment activity, what is the First Amendment protected activity you think occurred here?

MR. McNEAL: Your Honor, the protected activity is Logan Davis questioning the lawful authority of Officer Walleman's actions. He's critical of Officer Walleman's actions and repeatedly questions why Officer Walleman needs his identification. Shortly after that there's a quick takedown, there's force used, and then there's a subsequent arrest which was submitted to the prosecutor.

But the particular protected action is the criticism of Officer Walleman's actions, his repeated request for Officer Walleman to identify what lawful authority he's requesting the identification of. And that's been supported by case law that citizens do have the right to criticize public officials such as police officers and their -- the legality of their actions.

THE COURT: Well, what -- what -- what fact can you point to that the reason for the actions of the officer was the First Amendment activity as opposed to the reasonable suspicion of some kind of loitering and also the failure to produce identification?

MR. McNEAL: Well, Your Honor, it -- it is circumstantial evidence. It's -- as soon as he -- or it's

after Logan repeatedly questions Walleman's legal authority, and it's obvious that Walleman's annoyed by Logan Davis's questions because the arrest and the takedown happen immediately after that. So it's really the timing of events, Your Honor, that show the retaliatory First Amendment action.

We've presented claims that plaintiff repeatedly questions Walleman's legal authority, and then after that Walleman escalated the consensual encounter into an investigatory tension that quickly turned into an arrest and takedown. All of those are clearly adverse actions, Your Honor, so it's -- it's more circumstantial evidence of Defendant Walleman's anger and irritation at Logan's questioning that presents the jury question in this case, Your Honor.

THE COURT: Does qualified immunity protect the officer from a First Amendment claim as well?

MR. McNEAL: Absolutely not, Your Honor. The case of *Bloch*, the Sixth Circuit case of *Bloch* made it clear that -- in that case the plaintiff had made a complaint about a county sheriff not doing an adequate job of investigating a complaint, and shortly thereafter there was a press conference that disclosed the details of that rape that were embarrassing and offensive to the plaintiff in that case, and the Sixth Circuit held that that was sufficient grounds to support a First Amendment retaliation claim. So that right was clearly

established at the time of this incident in 2009, Your Honor.

THE COURT: All right. What -- what about your Count III here, are you -- are you also no longer pursuing that? You -- you -- you indicate you're not pursuing negligence, and Count III is called liability under state law against an individual defendant and it speaks of ministerial duties and individual decision making and it seems to be related to negligence. Are you also no longer pursuing Count III or what's your position on Count III?

MR. McNEAL: Your Honor, if you just would allow me to pull up the Complaint, I will -- I just want to make sure that I understand correctly which count that is.

(Brief pause)

Yes, Your -- Your Honor. The only claims, state law claims that we're pursuing are the intentional torts of the false arrest and false imprisonment claim under state law. No -- no negligence claims are being pursued, Your Honor.

THE COURT: All right. So in terms of the excessive force claim here, can you point to any cases that are similar to this where you have someone who refuses to put their hand behind their back, someone who refuses to provide identification and then they are taken to the ground and detained in this manner? Do you have cases that -- that describe this kind of application of force as being excessive to the point of violating a clearly established right?

MR. McNEAL: Your Honor, the particular facts of this case, I don't believe there -- we -- we cited any that are factually the same, but, Your Honor, any force that's used in this particular case as a matter of law would be excessive because there was never any reasonable suspicion or probable cause for the arrest in the first place. So any force that would be used against Logan Davis in this particular case as a matter of law would be excessive, so I --

THE COURT: Isn't it a separate inquiry though? I mean the level of force that was used here, for -- for it to be excessive, don't you -- don't you need to do the separate analysis on that?

MR. McNEAL: Yes, Your Honor, but the pertinent facts in that case would be that the plaintiff is un -- completely unarmed. He's never threatened the officer in any way. He didn't attempt to run, he didn't attempt to flee, so there would be no reason for any use of force. All Mr. Davis was doing was standing there and protesting his arrest. Nothing about that would allow a reasonable offer to -- officer to use any force under those circumstances. We have an unarmed plaintiff who's only verbally protesting, never threatens the officers at all, and is clearly in a work uniform waiting to be picked up by his father.

THE COURT: You don't -- you don't dispute that the video shows that, for instance, Mr. Davis did not give the

officer both of his hands? I mean the officer clearly had to -- he had -- had control over one of his arms but not the other arm and the plaintiff didn't present his other arm, did he?

MR. McNEAL: Your Honor, Your Honor, I -- I do -- I would agree with the notion that plaintiff did not voluntarily put his arms behind his back, but he was never actively resisting. And as the Court pointed out, Mr. Davis has a lawful right to resist an unlawful arrest. As the Court indicated in -- in *People vs. Moreno*, the State of Michigan explicitly allows citizens to resist an unlawful arrest. And in this case, because there was no probable cause for the arrest, Mr. Davis was not under any legal authority to submit to the arrest.

THE COURT: All right. Anything else that you'd like to add?

MR. McNEAL: Briefly, Your Honor. I -- I think there also is -- we didn't touch upon this, but there is for the state law claims evidence of malice and wanton disregard on behalf of Defendant Walleman. There's a point in the body camera, it's around the six-minute mark, when another officer jokes with Mr. -- seemingly jokes with Mr. Walleman about letting the dog out to get a piece of Logan's backside, and Officer Walleman responds that, "Yeah, if I had the popper, I probably would have." That evidence is circumstantial evidence

to show the malice and wanton disregard that Officer Walleman displayed towards Mr. Davis.

But other than that, Your Honor, I will stop there unless the Court has any further questions for me.

THE COURT: Okay. Thank you very much, Mr. McNeal.

So Mr. Petrusak, you may respond. I'll give you about five minutes. Go ahead, sir.

MR. PETRUSAK: Thank you, Your Honor.

I think part of the issue we have here, and it's part of the issue that has -- has -- that has existed since the night of the incident, is that plaintiff has always looked at everything that has happened through plaintiff's perspective. You know, plaintiff didn't have -- plaintiff didn't believe that he need to do give -- give the Officer Walleman his last name or provide identification because plaintiff subjectively in his own mind knew that no crime was being committed.

But that's not -- that's not the way we look at this. We look at this from the perspective of the officer and what the officer knew or reason -- and reasonably suspected. The officer -- the officer absolutely had reasonable suspicion to effectuate a stop to inquire as to what was happen -- what -- what the reason for his presence was in this closed plaza. And prior to any attempt by Mr. -- Mr. Davis to -- to show him, Officer Walleman, his shirt or anything else, Officer Walleman asked him for his last name and he -- he did not provide it

multiple times.

That -- that refusal to provide a last name, to identify yourself, in and of itself, is a violation of both the City's Code of Ordinances, it's a violation of state law. We cite the case of *Barrera vs. City of Mt. Pleasant* in our reply brief. That was a decision out of the Northern Division of this court by -- by Judge Ludington. That talks about MCL 754.79 that makes it a felony to -- to disobey a lawful command of a -- of an officer during a *Terry* stop to identify yourself.

After the briefing was concluded in that case, in this case, that decision was up on appeal to the Sixth Circuit, and on September 3rd, 2021 the Sixth Circuit Court of Appeals affirmed the -- the lower court's decision in *Barrera* determining that essentially based on the *Barrera* decision and a few other decisions out of this court, there was no clearly established -- there was no -- there was not a clearly established constitutional violation to arrest someone for not identifying themselves when you've been ordered to do so. The -- the case citation of that is 12 F dash -- F dash -- sorry, 12 F.4th 617, and again, that was a recent decision.

The -- the bottom line is even -- even if we're talking about loitering and the question surrounding loitering, probable cause existed in this case if there was probable cause to arrest Mr. Davis for any crime regardless of whether it was the actual crime that he was arrested for. So even if there's

some question about whether the showing of a shirt and had it -- had it been seen by Officer Walleman, which there's no evidence that it was, whether that would have dispelled the alarm for the loitering. But he had already been ordered prior to that to provide his last name, and then subsequent to that he had been ordered to provide ident -- his identification and he consistently refused to do so in --

THE COURT: Well, let me just ask you about this because I think it's an important point. So the loitering statute mentions both the providing of identification but also providing of an explanation as being capable of dispelling the concern or alarm that you have to have for loitering to exist.

Now, here we have both. We have -- we have the first name, which I have to admit and I agree is not a very good identification; it's incomplete. But we also have the other explanation: "I'm waiting for my dad, I just got off work at that store that's right -- right next to me two doors down and here's my shirt and my I.D." So there's the -- the surrounding circumstances which provide an explanation as well as the identification issue. And so I think that's what makes this case more complicated than just simply, "Well, he didn't give an I.D. so therefore he must be loitering."

MR. PETRUSAK: And -- and plaintiff's position is and has been and it was during his deposition that Officer Walleman was required as a matter of law to simply accept that

information and move on and not undertake any further investigation such as requiring him to produce -- to give a last name or requiring him to provide identification, but that's -- that's not correct. Just because -- the -- the fact of the matter is he can say he works at Firehouse Subs. It doesn't necessarily mean he's works at Firehouse Subs. Again, if he's working at Firehouse Subs, why is he not standing in front of Firehouse Subs? The dining room of Firehouse Subs was illuminated and that's where he works, yet he's down, a couple doors down in front of a darkened Dickey's Barbecue. It's not to say -- obviously we know now after the fact, hindsight, that his father shows up, he really did work at Firehouse Subs and all that. We under -- we understand that that's the fact. But we have to look at what the officer knew at the time, and it doesn't --

THE COURT: Right.

MR. PETRUSAK: And Officer Walleman's perception of it is, "Okay, you're telling me that, but your presence here doesn't match what you're telling me and at the same time you're refusing to identify yourself."

THE COURT: Let me ask you, since -- since we're -- you know, we're really getting into the weeds here on your loitering statute, which I never thought I'd get to know that much about Sterling Heights' loitering statute, Section 35-17. But that statute in Section (C) says, and it's almost like a

safe harbor, that a person cannot be convicted of loitering if the explanation they gave was true and that if it had been believed, it would have dispelled any alarm.

MR. PETRUSAK: That's correct.

THE COURT: Isn't that exactly what happened here? It was true, and if it had been believed, it would have dispelled any alarm because what alarm is there if it's a kid that just got off work and he's waiting to get picked up by his dad? And so this statute says you cannot be convicted of this offense if those circumstances are there, and aren't they there here?

MR. PETRUSAK: They're -- they were there after the fact certainly, but the -- the -- the difference is that they weren't there at the time. At the time he -- at the time he was -- he was investigating the loitering charge, he was -- the information he was given didn't necessarily make sense to him. He wasn't being given the person's name or anything else. And again, he's required under a separate city ordinance and a separate state law to identify himself and he's not doing that.

And so, yes, hindsight being 20/20 after the fact, after he's charged with loitering, he couldn't be -- once his father shows up at the scene and he says, "I'm here to pick him up, he works at Firehouse Subs, what happened?" and everything else, certainly at that point he can't be -- he couldn't be convicted under the loitering ordinance of having done that.

But that doesn't do anything to make the arrest in the first instance or the stop in the first instance unlawful because there was reasonable suspicion. There was probable cause or minimally qualified immunity. That's what the court in *Barrera* found was that the officers in that case were entitled to qualified immunity under state law because it was not a clearly established constitutional violation to arrest someone for not providing identification. And that -- that's what happened here and so the --

THE COURT: Well, there -- but it is -- but you would agree it is a clearly established violation if there was insufficient reasonable suspicion, correct?

MR. PETRUSAK: If there's -- I -- I think -- I think if you have reasonable suspicion that's not arguable, if -- if it's not arguable that a -- that an -- that the -- if it's that an officer had reasonable suspicion to -- of supporting the stop, then certainly that would be -- that would be true. But I think it is arguable in this case based on the facts and circumstances known to the officer at the time and the rather evasive responses that he was being given by plaintiff.

THE COURT: All right.

MR. PETRUSAK: I do want to address, if I could, two things.

THE COURT: Go ahead.

MR. PETRUSAK: The First Amendment retaliation claim,

there -- there's no evidence in the record that he -- that plaintiff was arrested because he was questioning Officer Walleman. Ever -- in -- in -- over and over and over on the -- on the in-car video you -- you hear Officer Walleman indicate to him the reason he was being arrest -- he -- he tells him that he's investigating loitering, and then you hear him tell him that he -- the reason -- that "you're not identifying yourself, I'm placing you under arrest." He tells him, "You had to give me your identification." The -- the arrest -- the reason he was arrested is because he didn't identify himself. It has nothing to do with his speech or his questioning of the officer. There's nothing in the record to support any of that.

And I -- and -- and the other point that I -- I -- I want to make, they do have their Elliott-Larsen Civil Rights Act claim and we haven't touched on that. Plaintiff -- plaintiff makes some assertions in their response to the motion that are just patently untrue. They misquote the in-car video to -- to make up a claim basically that they have direct evidence of racial discrimination by -- by -- by misquoting a question that plaintiff's father asked Officer Walleman. The -- on the audio --

THE COURT: Right, I know. I read that, I read that.

MR. PETRUSAK: Yes.

THE COURT: You're -- you're right on that, you're correct.

MR. PETRUSAK: I just wanted to make sure that that's clear because that -- there is no evidence that race played a role in this whatsoever, it -- there -- it's just not there.

And so, you know -- and so for the rest of it, we believe that minimally there -- the -- Officer Walleman is entitled to qualified immunity in this case based on the number of statutes that plaintiff could reasonably have been believed to have violated, and on that basis, we are requesting summary judgment of plaintiff's claims.

THE COURT: All right. Thank you very much. Yeah, well, there's -- there's -- there's no evidence of overt racial animus, I agree with you on that. I don't know if I agree that there's no evidence that race played any role, but that's not -- that's not really part of the legal claims that are supported from what -- from what I can see here, so...

Okay. So thank you very much, Mr. Petrusak, and thank you very much also, Mr. McNeal.

I think what I would like to do is to speak with you briefly on the Zoom call here off the record, but for now let's ask Mr. Weissberg to go ahead and recess the court, and thanks again to Ms. Cavanagh for her patience during our fast speaking hearing.

THE LAW CLERK: Thank you. The Court is now in recess.

(Court in recess at 3:01 p.m.)

— — —

## C E R T I F I C A T I O N

I, Linda M. Cavanagh, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing pages 1 through 37 comprise a full, true and correct transcript of the proceedings held in the matter of Logan Davis vs. Jeremy Walleman, et al, Case No. 20-11499, on Wednesday, February 16, 2022.

s/Linda M. Cavanagh
Linda M. Cavanagh, CSR, RPR, CRR, RMR, CRC, RDR
Federal Official Court Reporter
United States District Court
Eastern District of Michigan

Date: June 3, 2022
Detroit, Michigan